UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| Physicians ACO, LLC<br>       *Plaintiff*<br>v.<br><br>Computer Sciences Corporation,<br>and CSRA, Inc.<br>       *Defendant* | Civil Action No. 4:16−cv−01293<br>[Jury Trial Demanded] |

*PLAINTIFF'S FIRST AMENDED COMPLAINT*

TO THE HONORABLE MELINDA HARMON, DISTRICT JUDGE:

Plaintiff, Physicians ACO, LLC ("PACO") files its First Amended Complaint. This filing is made as a matter of right pursuant to Rule 15(a) (1) F.R.Civ.P., being filed within twenty-one (21) days of the date of filing of the Defendants Computer Sciences Corporation and CSRA (hereafter "Defendant") Motion to Dismiss, that was filed and served on May 16, 2016.

## *I.     Jurisdiction and Venue*

1.     Defendant removed this case to this Court on twin claims to federal jurisdiction: Diversity of citizenship and "Federal Person" jurisdiction under 28 U.S.C. §1332, 1441, 1442(a) (1) and 1446.  PACO does not dispute the existence of federal jurisdiction by reason of Defendant's assertion of a claim to  "federal

1

person" removal pursuant to 28 USC §1442(a)(1).[1]  A single basis for federal jurisdiction is sufficient.

2. No real property being at issue, venue is appropriate in this District under 28 USC§1391(e).

## II. Parties and Service

3. PACO is a Texas limited liability company formed as an accountable care organization ("ACO") having for 2012--2015 a Medicare Shared Savings contract with the Center of Medicare and Medicaid Services ("CMS"), a division of the United States Health and Human Services Administration.

4. Computer Sciences Corporation ("CSC") has appeared through counsel. No separate citation is necessary, and electronic service on counsel conforming to Rule 5 F.R.Civ.P., and the local rules of this Court providing for use of the Court's maintained "CM/ECF" electronic case filing and service system is sufficient.

5. CSRA, Inc. ("CSRA") has appeared through counsel. No separate citation is necessary, and electronic service on counsel conforming to Rule 5 F.R.Civ.P., and the local rules of this Court providing for use of the Court's maintained "CM/ECF" electronic case filing and service system is sufficient.

---

[1]  See Defendants' Notice of Removal [Case Document #1].  Defendant's Notice of Removal is deficient as to its claim to removal based on diversity of citizenship as to PACO, a limited liability company by failing to account for the LLC's members' citizenship.

### III.  Summary of the Allegations

6. PACO seeks damages from CSC and, or CRSA, individually or collectively, apportioned as they may have agreed among themselves to respond to claims as a part of the corporate reorganization giving rise to CSC's divestiture of its public contracting unit that became CRSA. PACO's claim is $6,000,000 exclusive of costs, interest, punitive damages, consequential or special damages.

7. PACO's claims arise under various theories including contract and tort, due to CSC's faulty design and implementation of an internet (web) access reporting portal called the "GPRO Portal" that CSC provided under contract to the United States Department of Health and Human Services Center for Medicare and Medicaid Services ("CMS") and its falsely reporting the adequacy before and after use of that system to March 21, 2014. It was though the GPRO Portal that CMS required PACO to lodge certain reports in compliance with its contract with CMS.

### IV. Background
### *The allegations in this section are Common to All Counts and incorporated into each cause of action without repetition*

8, PACO obtained a Medicare shared savings contract CMS with a 2012 start date. Such contracts, authorized by the Patient Protection and Affordable Care Act, allowed CMS to contract to share a portion of its deemed savings (actual cost vs the benchmark of what CMS expected to spend) on an assigned Medicare

beneficiary population attributed post hac by CMS to a contracting ACO providing[2] care coordination and other services to that population. The range of shared savings was to be up to 50% over the floor minimum of 3% to a maximum of 10% of the deemed savings. For its part, PACO as other ACOs undertook to provide elements of care coordination and case management not furnished to traditional Medicare beneficiaries and usually provided only for a fee in managed care circumstances. CMS, as part of the contract and to assure itself that the quality of care provided Medicare beneficiaries did not diminish, imposed periodic reporting and specific quality measures on a designated sample it selected of the assigned Medicare beneficiary population served by an ACO. Having imposed reporting requirements on its contracting ACOs, like PACO, CMS assumed the concomitant contractual obligation not to frustrate an ACO's ability to fulfil reporting obligations and therefore to provide a functioning means to receive and acknowledge required reports.

---

[2] ACOs use data management and other tools, and contracts with primary care providers agreeing to participate through the ACO in the shared savings program. The primary care providers ("PCP"), all of whom are licensed to practice medicine have accepted Medicare beneficiaries as part of their patient base. These patients, referred to by CMS as "Medicare beneficiaries" did not elect to participate in a managed care program. Through the ACO, the PCPs agree to provide otherwise uncompensated care coordination, case management and other non-traditional Medicare services with the ACOs tools toward the "triple aim" that includes reduced cost. CMS attributes Medicare beneficiaries to PCPs retrospectively based on the extent of percentages of care the beneficiary received from the PCP vs other providers. In so doing, CMS inelegantly requires PCPs in an ACO to treat 100% of the practice's Medicare patients as if attributed to the PCP in the ACO. Solely for ease of expression, this complaint collapses who provides medically necessary care, and attributes provision of medical services to beneficiaries performed by physicians contracting with the ACO to the ACO.

9. On information and belief, CMS did not mandate the functionality, architecture or design of the GPRO Portal but allowed CSC to do so and to manage subcontractors it engaged in the project.

10. The number of ACOs to report via the GPRO Portal was intended to grow. Defendant's contract with CMS was not static and its efforts to revise the GPRO Portal continuously underwent revisions reflecting the increasing numbers of ACOs and its continued use for other reporting practices[3].

11. CMS rolled out ACOs with shared savings contracts in waves. Its first tranche, ACOs with July 2012 start dates – of which PACO was one, was a cohort of 27 ACOs entering into such contracts with CSM. These ACOs were joined by a second flight of an additional 106 ACOs with January 1, 2013 start dates. All of these ACOs were to report their first year quality measures – on a non-normative check the box basis, through the GPRO Portal by the March 21, 2014 deadline.

12. CMS assigned a random order to its beneficiary sample and Defendant imposed a strict hierarchical order on how its GPRO Portal would accept information on that population. Defendant took that randomization of reporting and imposed a design and architecture that unreasonably hindered ACOs' performance of their contract requirement to submit timely GPRO reports. Under

---

[3] "GPRO" is understood to come from the initials of "Group Practice Reporting Option". While being used for receipt of ACO mandatory first year quality measures reports, it is understood that the same portal was also receiving group practice reports.

Defendant's design of the GPRO Portal, all of CMS' randomly selected beneficiary #1's input was required to be fully entered, errata reported back by the GPRO Portal to the ACO, fully corrected and correction acknowledged by the portal before ANY of CMS' randomly selected beneficiary #2's input would be processed, and so on for all randomly selected beneficiaries of all 2012 start ACOs. Part of CSC's design of the GPRO Portal was to make the GPRO Portal interactive and to perch or not populate reporting cells within an ACO's submissions of its GPRO Reports until all errata of its more senior data sets had been cured. Delay in the interactive GPRO Portal's response to the ACO becoming a critical point of system failure.

13. CMS rejected criticism of its proposed final rule for ACOs in the shares savings program that they must employ the GPRO Portal for reporting quality measures. CMS, clearly based on Defendant's false assurances regarding the GPRO Portal's functionality stated, "In weighing the various reporting options, CMS determined that the GPRO Web Interface [GPRO Portal] was "capable and well-tested and represent[ed] the best current option for quality reporting." 76 Fed. Reg. at 67,894. In response to comments "express[ing] concern * * * whether CMS ha[d] the resources to handle the incoming data" and one comment opining that "ACOs should [not] be held accountable for CMS problems with implementation[,]" CMS responded that [w]hile [it could] []not foresee all possible

6

future implementation issues, [it would] strive to mitigate any unforeseen issues swiftly and fairly."76 Fed. Reg. at 67,892.

14. CMS by requiring its entire first flight of ACOs to report their quality measures through the GPRO Portal by March 21, 2014 undertook the duty to its contracting parties, including PACO, to obtain for their benefit a workable reporting GPRO Portal and system sufficiently robust and with adequate bandwidth to permit successful reporting by the deadline. CMS delegated this obligation contractually to Defendant to design, build, implement and maintain a suitable GPRO Portal. Defendant did not suggest to CMS that it use a rolling due date or assign different deadline dates among ACOs.

15. By reason of its contract with CMS Defendant for profit voluntarily undertook to provide for PACO's benefit (as well as those in the first cohort of ACOs required to report by March 21st) a GPRO Portal that was sufficiently robust to accommodate data sets from each ACO on the day of the deadline.

16. Both CMS and Defendant had awareness of who the ACOs in the first cohort and flight were, and how many of them there would be crowding through the GPRO Portal on March 21, 2014.[4] Defendant breached its obligation. It designed the GPRO Portal as it required interactive responses from the GPRO

---

[4] See CMS Shared Savings Program News and Updates, available at:
https://www.cms.gov/medicare/medicare-fee-for-service-payment/sharedsavingsprogram/news.html (last visited on May 24, 2016).

Portal correcting errors before any other data could be entered, but lacked bandwidth, connectivity, and responsivity to meet the crush of data submitted on the deadline day.

17. Defendant's personnel negligently or falsely represented that the system was adequate to the challenge of the initial flight of 123 ACOs all seeking to pass their data sets through the GPRO Portal by March 21, 2014. As late as February 17th, 2014, CMS was apprehensive that there would be bottlenecks and roadblocks to resolve, particularly obtaining proper connectivity between Warrenton and Baltimore Data Center.

18. On information and belief Plaintiff alleges that Defendant negligently or falsely represented to CMS that its GPRO Portal was ready and adequate to the task when in fact Defendant knew that implementation of the system lacked sufficient bandwidth and functionality to handle the increased flight of ACOs reporting at the March 21st, 2014 deadline. By way of limited example, communications by CSC employee Joseph A Vogelpohl dated March 4, 2014 two weeks before the deadline, noted that additional work was necessary, and to Plaintiff's appreciation represented Defendant's appreciation that substantial additional work was necessary to obtain functionality.

19.. CMS officials thought, because CSC told them so, that CSC's design and implementation of the GPRO Portal for March 2014, capturing results for the

8

first contact year ending December 2013 was adequate. CSC misled CMS. For example, Jane Schiemer, identifying herself as Defendant's Application Architect Principal Leader wrote to CMS's Stan Ostrow, to report, falsely in PACO's view, that the GPRO Portal had not failed to timely process all submitted data.

20. In fact, Defendant's GPRO Portal's design and implementation was not adequate, failing on several occasions during the March 2014 GPRO filing period, and failing to process and accept PACO's filings submitted on March 21st 2014.

21. CMS refused to accept PACO data tendered after the deadline, in material part based on the false assertions of Defendant Schiemer, that the system's performance was adequate. CMS denied PACO any part of shared savings its acts had created during the first contract [18 month] year.

22. CMS calculated that the amount of MSSP shared savings to which PACO was entitled and would have received but for its inability to get its required reports through the GPRO Portal exceeded $6,000,000.00 and would have been paid to PACO on or before November 2014.

23. All conditions precedent to suit have occurred.

24. To vindicate its rights, PACO has been required to engage counsel and has become indebted to its counsel for a reasonable attorney fee.

## V. First Cause of Action – Breach of Contract

25.     Defendant knew that PACO was within the universe of parties for whom the GPRO Portal was the required instrument to lodge data with CMS on March 21st, 2014, and was aware that PACO was among the intended beneficiaries of CMS' contract with it for implementation and use of the GPRO Portal.

26.     Defendant knew that CMS owed PACO and other March 21st deadline filers a contractual duty not to hinder unreasonably their performance of contractual obligations in filing their GPRO reports. CMS delegated the instrument for receiving and processing these reports, the GPRO Portal to Defendant.

27.     Defendant knew and priced its contract with CMS to reflect that it would be exposed to consequential damages to ACOs who were rendered unable to timely file their required reports by the March 21st, 2014 deadline due to failures of design, architecture, bandwidth, robustness, implementation, maintenance or other defects in the GPRO Portal.

28.     Defendant breached its obligations to both CMS and PACO by its actual design, implementation and maintenance of the GPRO Portal as deployed during the shared savings contract's first contract year reporting period ended March 21, 2014. Such failure caused PACO foreseeable consequential damages of

the loss of payment for its first contract year (18 month) shared savings distribution, otherwise payable but for the GPRO Portal's failure to accept its data.

29. There is no applicable limitation on PACO's rights to recover against Defendant either by statute, public policy or otherwise.

30. Pursuant to Tex. Civ. Prac. & Rem. Code §38.01, or any other law permitting recovery of its fees and expenses, PACO seeks recovery of reasonable attorney fees from Defendant incurred in the prosecution of its claims against Defendant through trial and conditional amounts of attorney fees incurred should Defendant (or either of them) unsuccessfully challenge a judgment rendered in PACO's favor.

### *VII Second Cause of Action: Negligence/Fraud*

a. Negligent design of GPRO Portal

31. Defendant undertook contractually, and as a result had a duty to take due care and to exercise good and workmanlike performance to properly design and maintain the GPRO Portal. CSC breached those duties. PACO was damaged by CSC's failure to design CMS' GPRO Portal that was sufficiently robust, adequately staffed and maintained as to permit its contract year ending December 31, 2013 GPRO Reports to be timely received and acknowledged on March 21, 2014. Such failures were a proximate cause of PACO's damages.

b. Negligent operation of GPRO Portal

32.     CSC undertook contractually, and as a result had a duty of due care, to properly maintain the GPRO Portal particularly during periods of its most acute stress – the day of reporting deadline, March 21, 2014.  CSC breached that duty failing to maintain and properly care for the GPRO Portal. PACO was damaged by CSC's failure to implement, operate and maintain the GPRO Portal as to permit its contract year 2013 GPRO Reports to be timely received and acknowledged on March 21, 2014. Such failures were a proximate cause of PACO's damage.

      c.  Negligent Misrepresentation

33.     Defendant's personnel were called upon by CMS prior to the deadline for ACO's first contract year (ending December 31, 2013) GPRO submissions to confirm that the GPRO Portal could handle the expected reporting onslaught. Defendant had a financial interest in providing an affirmative response to this requested confirmation and a financial interest in providing information regarding the GPRO Portal for CMS and ACOs' guidance.  Its personnel negligently represented that the GPRO Portal, staffing and maintenance were adequate. After PACO complained to CMS that the GPRO Portal had failed on the March 21st deadline, CSC's personnel negligently represented to CMS that the GPRO Portal had properly functioned.   These acts were a proximate cause of PACO's damages.

      d. fraud

34. CSC personnel in the weeks leading up to the March 2014 deadline and shortly thereafter falsely represented to CMS that the GPRO Portal for use through March 21, 2014 was adequate for its intended purposes when Defendant's personnel knew that it was not. Even when PACO complained to CMS that the GPRO Portal had failed, Defendant's personnel falsely represented to CMS that the GPRO Portal had been sufficient. PACO was damaged by Defendant's false certification to CMS that the GPRO Portal was adequate to receive and process PACO's data along with the other ACOs' data being submitted on March 21, 2014 when it was not. These acts were a proximate cause of PACO's damage.

### VIII. Damages and Punitive Damages

35. PACO sustained direct damages in not receiving its portion of shared savings determined by CMS for its first contract [18 month] year. PACO's portion of those savings was determined by CMS to be in excess of Six Million ($6,000,000) dollars. PACO also sustained foreseeable consequential damages from not having those funds available by November 2014 when CMS distributed to qualified ACOs their first contract year shared savings.

36. PACO seeks punitive damages for Defendant's intentional misleading and misrepresentation that the GPRO Portal was adequate and functional for the March 21, 2014 deadline. Defendant's actions by its authorized personnel on the GPRO Portal project misleading or misrepresenting the adequacy, status, integrity

and functionality of the GPRO Portal it had designed for use for the March 21, 2014 GPRO Reporting deadline are attributed to Defendant as a corporate entity. Defendant is liable for exemplary damages without regard to the cap provided by Chapter 41 Tex. Civ.Prac. & Rem. Code, and it is liable for constitutionally appropriate punitive damages in relation to such torts as are found by the trier of fact. Solely for the guidance of the jury, PACO advises that by statute the legislature of the State of Texas imposes treble damages in cases of fraud in connection with the sale of land, securities, and on showing of intentional deceptive trade practices additional damages of up to three times actual damages.

## IX. Prayer

Wherefore premises considered Physicians ACO, LLC prays that Defendants Computer Sciences Corp. and CSRA, Inc., give answer, and that upon just trial of this cause that it have judgment for its damages, both actual, consequential, general and special and such punitive damages as may be constitutionally appropriate to the injury caused, and that it recover its costs of suit and such attorney fees as may be allowed for any cause of action permitting or requiring its recovery of attorney fees from Defendants – including conditional awards of attorney fees in the event of Defendant(s)' unsuccessful actions for review of such judgment by appeal or otherwise -- and that it have such other and further relief, in law or in equity to which it may be justly entitled.

Respectfully Submitted
June 3, 2016

>*/S/ Barry A. Brown*
>Barry A. Brown
>SD TX Bar No. 38859
>SBOT No. 03093000
>Suite 1100, The Arena Tower
>7322 Southwest Freeway
>Houston, Texas 77074
>Tel:   713 981 3880
>Fax:   713 981 3881
>e-mail:  tebear05@msn.com
>Attorney For: Plaintiffs
>
>***PLEASE NOTE NEW ADDRESS***
>***AFTER JUNE 24, 2016***
>6575 WEST LOOP S.
>SUITE 500
>BELLAIRE, TX 77401

<u>Certificate of Service</u>

I certify that on the date below by relying on the Court's CM/ECF electronic system of notification and service, that I complied with service requirements of the foregoing by causing it to be served electronically on all counsel of record in this cause concurrent upon its filing.

Dated:  June 3, 2016

>*/S/ Barry A. Brown*